## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-----------------------------------------------------------------------x

In re:

FBI WIND DOWN, INC. (f/k/a Furniture
Brands International, Inc.), *et al*.,

Debtors.[1]

-----------------------------------------------------------------------x

FBI WIND DOWN, INC. LIQUIDATING TRUST, by and
through Alan D. Halperin, as Liquidating Trustee,

Plaintiff,

- against -

CAREERS USA, INC. a/k/a CAREERSUSA,

Defendant.

-----------------------------------------------------------------------x

Chapter 11

Case No. 13-12329 (CSS)

Adv. Proc. No. 15-51324
(CSS)

## DEFENDANT'S MOTION FOR SUMMARY JUDGEMENT
## AND INCOPORATED MEMORANDUM OF LAW

Defendant, Careers USA, Inc. a/k/a CareersUSA ("Careers" or "CareersUSA"), pursuant

to Federal Rule of Civil Procedure 56(a), as incorporated by Federal Rule of Bankruptcy Procedure

7056, hereby moves for summary judgement and states:

## I.   **Background**

This is an adversary proceeding (Adv. Proc. No. 15-51324) brought by the Plaintiff, FBI

Wind Down, Inc. Liquidating Trust, by and through Alan D. Halperin, as Liquidating Trustee

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each debtor's tax identification number, as applicable, are: FBI Wind Down, Inc. (7683); AT Wind Down, Inc. (7587); BFI Wind Down, Inc. (3217); BHF Wind Down, Inc. (8844); BR Wind Down, Inc. (8843); BT Wind Down, Inc. (1721); FBH Wind Down, Inc. (2837); FBO Wind Down, Inc. (4908); FBRC Wind Down, Inc. (1288); HFI Wind Down, Inc. (7484); HR Wind Down, Inc. (6125); HT Wind Down, Inc. (4378); LFI Wind Down, Inc. (5064); LHFR Wind Down, Inc. (9085); LV Wind Down, Inc. (8434); MSFI Wind Down, Inc. (7486); TFI Wind Down, Inc. (6574); THF Wind Down, Inc. (3139); and TR Wind Down, Inc. (6174).

1

("Plaintiff"), against Defendant, Careers USA, Inc. a/k/a CareersUSA ("CareersUSA" or "Defendant"), in connection with Chapter 11 Case No. 13-12329 (CSS). CareersUSA provided temporary staffing services to the entity formerly known as Furniture Brands International, Inc., which is now FBI Wind Down, Inc., one of the debtors in the underlying bankruptcy case (i.e. Chapter 11 Case No. 13-12329 (CSS)), and also provided staffing services to the entity formerly known as Thomasville Furniture Industries, Inc. (now TFI Wind Down, Inc.), another debtor in the underlying bankruptcy case (Furniture Brands International, Inc. (now FBI Wind Down, Inc.) and Thomasville Furniture Industries, Inc. (now TFI Wind Down, Inc.) collectively referred to as "FBI" or "debtor"). CareersUSA provided staffing services to the entity formerly known as Furniture Brands International, Inc. pursuant to the parties' Temporary Labor Services Agreement (the "Agreement"), a copy of which is attached hereto as Exhibit "A" and made part hereof.[2] CareersUSA complied with and performed all of its promises, obligations and duties pursuant to the terms of the Agreement – this is not in dispute. Plaintiff, however, breached its express obligations under the term of said Agreement, including but not limited to the theft of Defendant's personnel in direct violation of the same. Notwithstanding, Plaintiff brought an action against CareersUSA alleging multiple preference claims as well as fraudulent transfer claims against CareersUSA. CareersUSA has denied Plaintiff's misguided and erroneous allegations, and hereby seeks summary judgment in its favor and against the Plaintiff for the reasons set forth in this Motion for Summary Judgement.

---

[2] CareersUSA was asked to sign the Agreement first in time and the parties proceeded upon the terms set forth therein as the Agreement was countersigned; however, at this time, CareersUSA is unable to locate said copy.

## II.    **Legal Standard**

Federal Rule of Civil Procedure 56(a), made applicable to adversary proceedings by Federal Rule of Bankruptcy Procedure 7056, provides, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "Summary judgment 'should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'" *In re Vaso Active Pharmaceuticals, Inc.*, 2012 WL 4793251 (Bankr. D. Del. 2012). "Once the moving party has made a proper motion for summary judgment, the burden shifts to the non-moving party..." *See generally In re Pillowtex Corp.*, 427 B.R. 301, 305 (Bankr. D. Del. 2010). "[W]hen a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment, if appropriate, shall be entered against that party." *Id. (citing* F.R.C.P. 56(e)(2); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

## III.    **Argument**

A)    <u>Plaintiff May Not Avoid any Transfers of any Interests of the Entity Formerly Known as Furniture Brands International, Inc. ("FBI") because All such Transfers were Made in the Ordinary Course of Business or Financial Affairs of the Debtor, FBI, and the transferee, CareersUSA.</u>

1.    Plaintiff's attempt to avoid transfers of interests of the entity formerly known as Furniture Brands International, Inc. (now FBI Wind Down, Inc.) is misguided and must necessarily fail because all such transfers were in payment of a debt incurred by the debtor, FBI, in the ordinary

course of business or financial affairs of the debtor and CareersUSA, the transferee, and all such transfers were in fact made in the ordinary course of business or financial affairs of the debtor and the transferee.[3]

2.    "Section 547(c)(2)(A) of the United States Code permits a "safe harbor" for a transferee of a preferential payment if "such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was—(A) made in the ordinary course of business or financial affairs of the debtor and the transferee...." *In re Archway Cookies*, 435 B.R. 234, 240 (Bankr. D. Del. 2010) (*citing* 11 U.S.C. § 547(c)(2)(A)). *See also In re American Home Mortgage Holdings, Inc.*, 476 B.R. 124, 135 (Bankr. D. Del. 2012) ("Section 547(c)(2) permits a "safe harbor" for a transfer of a preferential payment if 'such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was' (a) made in the ordinary course of business or financial affairs of the debtor and the transferee, or (b) made according to 'ordinary business terms.'").

3.    "Under 11 U.S.C. § 547(c)(2), the 'ordinary course of business exception' permits a creditor to retain transfers made by a debtor to a creditor during the ninety days before the petition date if: (1) such transfers were made for a debt incurred in the 'ordinary course of business' of the parties; and either (2) the transfers were made in the 'ordinary course of business' of the parties; or (3) the transfers were made in accordance with 'ordinary business terms.'" *Id.*, 435 B.R. *at* 241.

4.    "Whether payment was made in the ordinary course of business is a subjective inquiry as to the normal payment practices between the parties." *Id.*, 435 B.R. *at* 240-41. *See also In re Hechinger Inv. Co. of Del., Inc.*, 320 B.R. 541, 548 (Bankr. D. Del. 2004) (stating that the

---

[3] *See* Defendant's Answer and Affirmative Defenses [D.E. 44], Thirteen Defense *at* p. 15.

determination as to whether the ordinary course of business exception applies is a subjective test involving the consistency of transactions between the debtor and creditor before and during the preference period).

5.     The courts consider various factors in determining the aforementioned consistency of transactions between the debtor and creditor:

> (1) the length of time the parties have engaged in the type of dealing at issue; (2) whether the subject transfer was in an amount more than usually paid; (3) whether the payments were tendered in a manner different from previous payments; (4) whether there appears any unusual action by either the debtor or creditor to collect or pay on the debt; and (5) whether the creditor did anything to gain an advantage (such as gain additional security) in light of the debtor's deteriorating financial condition.

*Id.* (citing *In re Allegheny Health, Education and Research Foundation,* 292 B.R. 68 (Bankr.W.D.Pa.2003)). *See also In re American Home Mortgage,* 476 B.R. *at* 135-136.

6.     These factors were considered as part of the analysis in the bankruptcy action underlying the instant adversary proceeding. Specifically, the Court in *In re FBI Wind Down, Inc.,* 581 B.R. 116 (Bankr. D. Del. 2018) took such factors into consideration and ultimately granted summary judgment, in part, ruling that a majority of transfers could not be avoided by the trustee of FBI Wind Down Liquidating Trust in consideration of the defendant's valid ordinary course of business defense.

7.     In the instant adversary proceeding, each of the enumerated factors cut in favor of CareersUSA, *to wit*: (1) CareersUSA and FBI engaged in the type of dealing at issue (i.e. payment in exchange for staffing services rendered) for nearly three (3) years; (2) the subject transfers were typically in the same or similar amounts as was usually paid by FBI to CareersUSA; (3) the payments were made in the same manner as previous payments from FBI to CareersUSA; (4) there was no unusual action taken by either the debtor or creditor to collect or pay on the debt; and (5)

CareersUSA did nothing to gain an advantage in light of FBI's deteriorating financial condition as it was unaware of the same during the time frame in question.

8.    "When a debtor-creditor relationship 'has been cemented long before the onset of insolvency—up through and including the preference period—we should pause and consider carefully before further impairing a creditor whose confident, consistent, ordinary extension of trade credit has given the straightened debtor a fighting chance of sidestepping bankruptcy and continuing in business.'" *In re Archway Cookies*, 435 B.R. *at* 241 (*citing In re Molded Acoustical Products, Inc.,* 18 F.3d 217, 219 (3d Cir.1994); *In re Elrod Holdings Corp.,* 426 B.R. 106, 111 (Bankr. D. Del. 2010)).

9.    The Court need look no further than the exhibits attached to Plaintiff's Complaint[4] to see that the subject payments/transfers were made in the ordinary course of business or financial affairs of the debtor and transferee.

10.    Stated another way, the exhibits attached to Plaintiff's Complaint represent the payment history between the debtor and CareersUSA during the "preference period" and said exhibits clearly reflect that payments made by FBI to CareersUSA for temporary staffing services rendered were not out of the ordinary course of business and in fact, were quite regular in terms of payment time frame…to the extent that CareresUSA would not have expected Plaintiff to become insolvent.

11.    Specifically and as set forth in greater detail in the Affidavit of Joan Lassman in Support of Defendant's Motion for Summary Judgment, a copy of which is attached hereto as

---

[4] *See* [D.E. 1-1] & [D.E. 1-2]

Exhibit "B" and made a part hereof, payments from FBI to CareersUSA were typically made within a fifty-six (56) day timeframe, i.e. on average, there was approximately fifty-six (56) days between the invoice date and the transfer clear date.[5]

12.    Per the exhibits attached to Plaintiff's Complaint, a review of the transfers made from the debtor, FBI, to the transferee, CareersUSA, indicate that nearly ninety percent (90%) of CareersUSA's invoices were paid by FBI within the same timeframe, i.e. payment was consistently made between twenty-four (24) and seventy-four (74) days.[6]

13.    This was the usual and customary time frame for payments from FBI to CareersUSA, and this was generally consistent throughout the parties' business relationship, whether during the "preference period" or otherwise.[7]

14.    More specifically, fifteen (15) of the CareersUSA invoices listed by Plaintiff in the exhibits to its Complaint were paid by FBI within twenty-four (24) to thirty (30) days from the invoice date; fifteen (15) of the invoices were paid within thirty-one (31) to forty (40) days; fifty-four (54) invoices were paid within forty-one (41) to fifty (50) days; forty-seven (47) invoices were paid within fifty-one (51) to sixty (60) days; twenty (20) invoices were paid within sixty-one (61) to seventy (70) days; and nine (9) of CareersUSA's invoices were paid by FBI within seventy-one (71) to seventy-four (74) days.[8]

---

[5] *See* Affidavit of Joan Lassman *at* Paragraph 8.

[6] *See* Affidavit of Joan Lassman *at* Paragraph 9.

[7] *See* Affidavit of Joan Lassman *at* Paragraph 10.

[8] *See* Affidavit of Joan Lassman *at* Paragraph 11.

15.    In determining ordinary course of dealings between parties, "[c]ourts place particular importance of the timing of payment." *See In re American Home Mortgage*, 476 B.R. at 137 (*citing In re Archway Cookies,* 435 B.R. *at* 243).

16.    Even FBI itself, via its responses to Request for Admission No. 3 of Careers' First Request for Admissions to Plaintiff, admits that each "transfer" (i.e. each payment made by the debtor to Careers within ninety (90) days of the September 9, 2013 petition date) was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and Careers.[9]

17.    Also worthy of note, each of the transfers in question was made by FBI to CareersUSA according to the ordinary, express business terms set forth in the Temporary Labor Services Agreement by and between CareersUSA and the entity formerly known as Furniture Brands International, Inc.

18.    "The 'ordinary business terms' test of section 547(c)(2)(B) is necessarily a broad one, and the evidentiary standard is not formidable." *Id.*, 476 B.R. *at* 141.

19.    The Temporary Labor Services Agreement by and between FBI and Careers, a copy of which is attached hereto as Exhibit 'A", expressly provides for payment to be made by FBI within sixty (60) days after receipt of CareersUSA's invoices.[10]

---

[9] *See* Plaintiff's Responses to Defendant's First Request for Admissions, Response to Request for Admission No. 3.
[10] *See* Exhibit "A" at Page 4, Section 2.

20.     As detailed in the Affidavit of Joan Lassman, payments from FBI to CareersUSA were made, on average, within fifty-six (56) days of the invoice date.[11]

21.     Also stated in her Affidavit, Ms. Lassman would typically contact FBI's accounts payable department to ensure that payments would be forthcoming.  Said contact was a regular and customary practice employed by CareersUSA in the ordinary course of its business or financial affairs with FBI.[12]

22.     In fact, while Ms. Lassman's collection efforts were indeed customary for this account, the same or similar collection efforts are customary throughout the staffing industry.[13]

23.     At times, Ms. Lassman would advise FBI that absent payment, Careers would necessarily have to halt the provision of its temporary employees for assignment with FBI.  This was a customary collections practice of Careers in the ordinary course of its business or financial affairs with FBI, as well as with other clients of Careers.[14]  Further this practice occurred well before the preference period.

24.     Further, if Ms. Lassman's collection efforts did not attain the desired results, she would regularly and customarily enlist the assistance of Careers' in-house legal department.  Ms. Lassman did this on at least two (2) occasions to assist in obtaining payment from FBI for staffing services rendered by Careers, which included times over a year prior to the preference period.[15]

---

[11] *See* Affidavit of Joan Lassman *at* Paragraph 8.

[12] *See* Affidavit of Joan Lassman *at* Paragraph 5; Affidavit of Mandy Wilson in Support of Defendant's Motion for Summary Judgment, a copy of which is attached hereto as Exhibit "C" and made a part hereof, *at* Paragraph 6.

[13] *See* Affidavit of Mandy Wilson *at* Paragraph 22.

[14] *See* Affidavit of Joan Lassman *at* Paragraph 6; Affidavit of Mandy Wilson *at* Paragraph 7.

[15] *See* Affidavit of Joan Lassman *at* Paragraphs 12-13; Affidavit of Mandy Wilson *at* Paragraph 20-21.

25.     Consequently, given the ordinary course of business or financial affairs between FBI and Careers, FBI cannot be permitted to now avoid and recover "preferential transfers" as it seeks to do via the Complaint.

26.     Accordingly, for the reasons set forth in this Motion and the Affidavits filed in support thereof, in conjunction with the applicable sections of the United States Code and established case law precedent, Careers requests that summary judgement be entered in its favor and against the Plaintiff, FBI Wind Down, Inc. Liquidating Trust, by and through Alan D. Halperin, as Liquidating Trustee.

B)     Plaintiff May Not Avoid any Transfers of any Interests of the Entity Formerly Known as Furniture Brands International, Inc. ("FBI") because such Transfers were Intended by FBI and CareersUSA to be a Contemporaneous Exchange for New Value Given.

27.     Plaintiff's attempt to avoid transfers of interests of the entity formerly known as Furniture Brands International, Inc. (now FBI Wind Down, Inc.) also fails because all such transfers were intended by the debtor, FBI, and the creditor, CareersUSA, to be a contemporaneous exchange for new value (i.e. staffing services) given to the debtor, and there was in fact substantially contemporaneous exchanges in connection with said value given to the debtor by CareersUSA.[16]

28.     In order to prevail on a contemporaneous exchange for new value defense under Section 547(c)(1) of the United States Code, a defendant must prove that: (1) it extended new value to the debtor; (2) the parties intended the new value and the disputed transfers to be contemporaneous exchanges; and (3) the exchanges were in fact substantially contemporaneous.

---

[16] *See* Defendant's Answer and Affirmative Defenses [D.E. 44], Twelfth Defense *at* p. 15.

*See In re APS Holding Corp.*, 282 B.R. 795, 800 (Bankr. D. Del. 2002) (citing *In re Contempri Homes, Inc.,* 269 B.R. 124, 128 (Bankr.M.D.Pa.2001); *Sapir v. Keener Lumber Co. (In re Ajayem Lumber Corp.),* 143 B.R. 347, 352 (Bankr.S.D.N.Y.1992)). *See also FBI Wind Down, Inc.,* 581 B.R. *at* 413 ("To gain a contemporaneous exchange defense, the Defendant must prove "(1) it extended new value to the debtors; (2) the parties intended the new value and the disputed transfers to be contemporaneous exchanges; and (3) the exchanges were, in fact, substantially contemporaneous.")

29.    "[T]he critical inquiry in determining whether there has been a contemporaneous exchange for new value is whether the parties intended such an exchange." *Id.* (*citing Creditors' Committee v. Spada,* 903 F.2d 971, 975 (3d Cir.1990)).

30.    Much like the analysis performed in Section III(A) above with respect to the ordinary course of business defense,[17] the factors associated with the contemporaneous exchange for new value defense also cut in favor CareersUSA.

31.    Specifically, (1) CareersUSA extended new value to the debtor in the form of weekly/daily staffing services, (2) both CareersUSA and FBI intended for the new value and the disputed transfers to be contemporaneous exchanges, and (3) the exchanges (i.e. FBI's payment for CareersUSA's services rendered) were in fact substantially contemporaneous.

32.    In order to determine whether a transaction qualifies as a substantially contemporaneous exchange, the majority of courts employ a totality of circumstances approach. *See In re Hayes Lemmerz International, Inc.,* 329 B.R. 136, 140 (Bankr. D. Del. 2005).

---

[17] *See* Paragraph 7, *supra.*

33.    "Relevant circumstances include: (1) the length of delay, (2) the reason for the delay, (3) the nature of the transaction, (4) the intentions of the parties, and (5) the possible risk of fraud." *Id.* (citing *Pine Top Ins. Co. v. Bank of Am. Nat'l Trust & Sav. Ass'n,* 969 F.2d 321, 328 (7th Cir.1992)).

34.    In this case and as described in Section III(A) above, delays in payment from FBI to CareersUSA were virtually non-existent.

35.    In fact, Plaintiff's very own exhibits (attached to its Complaint) reveal that nearly ninety percent (90%) of CareersUSA's invoices were paid by FBI within the same timeframe during the preference period, i.e. on average, there was approximately fifty-six (56) days between the invoice date and the transfer clear date.[18]

36.    Further, the parties always intended for their exchanges (i.e. FBI's payment for CareersUSA's services rendered) to be contemporaneous in nature, and the possible risk of fraud, at least from CareersUSA's perspective, was very low given the regularity of payments from FBI, so much so that CareersUSA would not have even expected Plaintiff to become insolvent.  Careers also did not have access to the debtor's current P&L or balance sheet or other financial statements reflecting a current, real-time status for FBI.

37.    Further evidence of the parties' intent for their exchanges to be contemporaneous in nature may be seen in the form of wire transfer payment(s) issued by FBI to CareersUSA substantially contemporaneously with the provision of staffing services from CareersUSA to FBI.

---

[18] *See* Affidavit of Joan Lassman *at* Paragraphs 8-9.

By way of example, FBI wired a payment to CareersUSA on August 30, 2013 for staffing services rendered in July and August of 2013.[19]

38.    It is not uncommon for clients to pay by credit card, ACH, wire or check and vary their payment methods throughout the relationship. It is also common for clients to make payments at different times and not always according to exact terms especially when servicing multiple locations like FBI since different sites may approve invoices for payment at different times. For example, sometimes a site would skip an invoice or skip a person on an invoice and might pay another invoice sooner in time as the "approver" was not in town or going to be out.[20]

39.    CareersUSA provided daily personnel services to FBI as FBI requested staff to continue to operate its business. Unbeknownst to CareersUSA was FBI's financial situation. By providing services to FBI, it is now apparent that this assisted FBI to continue operations for the betterment of all creditors. However, to now disallow such payments would harm CareersUSA for its benevolent assistance. Further, it is now clear that FBI knew of its financial situation and ordered staff from CareersUSA, knowing that CareersUSA would have to pay wages to the personnel each week, while FBI did not have to hire its own employees directly and pay their wages and taxes and which would be treated in bankruptcy as a different class of claims. To make CareersUSA repay any amounts FBI paid to CareersUSA during the preference period would permit FBI to get away with claim manipulation but also increase the creditor recovery amount to the detriment of one creditor that assisted FBI in running its business operations which allowed

---

[19] *See* Affidavit of Mandy Wilson *at* Paragraph 16.

[20] *See* Affidavit of Mandy Wilson *at* Paragraph 17.

the creditor pool to be arguably higher.    CareersUSA paid weekly wages; FBI paid CareersUSA to reimburse for such wages with minimal profit.[21]

40.    Worthy of note is the fact that this Court ruled in *FBI Wind Down, Inc. v. Innovative Delivery Systems, Inc.*, 581 B.R. 387 (Bankr. D. Del. 2018) that the contemporaneous exchange defense did <u>not</u> apply to "[p]ayments made in satisfaction of services completed between 11 to 417 days before payment."

41.    The circumstances in *FBI Wind Down, Inc. v. Innovative Delivery Systems, Inc.*, however, do not reflect or even closely resemble the circumstances between FBI and CareersUSA, wherein approximately ninety percent (90%) of CareersUSA's invoices were paid by FBI within twenty-four (24) to seventy-four (74) days of the invoice date.[22]

42.    As a result, in light of the substantially contemporaneous exchanges for new value provided to FBI by CareersUSA, FBI cannot be permitted to now avoid and recover the subject "preferential transfers".

43.    Additionally, "Section 547(c)(4) of the Bankruptcy Code provides that a transfer may not be avoided to the extent that 'after such transfer, such creditor gave new value to or for the benefit of the debtor – (A) not secured by an otherwise unavoidable security interest; and (B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor.'" *See In re American Home Mortgage*, 476 B.R. *at* 143 (*citing* 11

---

[21] *See* Affidavit of Mandy Wilson *at* Paragraph 18.

[22] *See* Affidavit of Joan Lassman *at* Paragraphs 9.

U.S.C. § 547(c)(4)). Each week arguably new value was given to FBI via the provision of new staff and their weekly work.

44.    In this case, Careers provided new value to and for the benefit of FBI in the form of staffing services, and (a) said value was not secured by an otherwise unavoidable security interest and (b) the debtor did not make an otherwise unavoidable transfer for the benefit of Careers, but rather did so for the benefit of Plaintiff's joint employees, subcontractors, contractors and/or associates who performed work for Plaintiff.[23]

45.    Similarly, "[i]n order to invoke successfully the subsequent new value defense in this Circuit the creditor must establish two elements: (1) after receiving the preferential transfer, the creditor must have advanced "new value" to the debtor on an unsecured basis; and (2) the debtor must not have fully compensated the creditor for the "new value" as of the date that it filed its bankruptcy petition." *In re Sierra Concrete Design, Inc.*, 463 B.R. 302, 307 (Bankr. D. Del. 2012) (*citing New York City Shoes, Inc. v. Bentley Int'l Inc.*, 880 F.2d 679, 680 (3d Cir.1989)).

46.    The creditor in this case, CareersUSA, did advance new value to the debtor, FBI, on an unsecured basis after receiving the alleged preferential transfer, and FBI did not fully compensate CareersUSA for this new value as of the September 9, 2013 petition date.[24] CareersUSA is still owed money from FBI in the amount of one hundred thirty-six thousand five hundred eighty dollars and seventeen cents ($136,580.17), which amount is comprised of ten thousand six hundred fifty six dollars and ninety-seven cents ($10,656.97) as indicated on

---

[23] *See* Defendant's Answer and Affirmative Defenses, Affirmative Defense No. 10; Affidavit of Mandy Wilson *at* Paragraph 11. *See also* Section III(C) below.

[24] *See* Defendant's Answer and Affirmative Defenses, Affirmative Defense No. 7 ("…CareresUSA was misled by Plaintiff and had its personnel stolen [without payment therefore and] services compromised….")

CareesUSA's Proof of Claim Form dated November 22, 2013, a copy of which is attached hereto as Exhibit "D" and made a part hereof, and one hundred twenty-five thousand nine hundred twenty-three dollars and twenty cents ($125,923.20) in the form of "separation fees" for those CareersUSA temporary associates that were "stolen" or improperly converted onto FBI's payroll in violation of the terms of the parties' Agreement and without CareersUSA's consent and without payment to CareerUSA therefore.

47.    CareersUSA actually provided new value to FBI each week in the form of newly-provided staffing services rendered by newly-provided staffing associates.[25]

48.    Accordingly, for the reasons set forth in this Motion, in conjunction with the Affidavits filed in support thereof and established case law precedent, Careers requests that summary judgement be entered in its favor and against the Plaintiff, FBI Wind Down, Inc. Liquidating Trust, by and through Alan D. Halperin, as Liquidating Trustee.

C)    Plaintiff May Not Avoid any Transfers of any Interests of the Entity Formerly Known as Furniture Brands International, Inc. ("FBI") because such Transfers are Not Preferential Transfers as Alleged and may Not be Avoided nor Recovered by the Plaintiff

49.    In addition to the grounds set forth in Sections III(A) and III(B) above, Plaintiff's attempt to avoid transfers of interests of the entity formerly known as Furniture Brands International, Inc. (now FBI Wind Down, Inc.) also fails because the "Transfers" referenced throughout Plaintiff's Complaint are not preferential transfers as alleged and consequently, may

---

[25] *See* Affidavit of Mandy Wilson *at* Paragraph 14.

not be avoided as preferences under the Bankruptcy Code, nor recovered by Plaintiff from CareersUSA.[26]

50.     United States Code § 547(b) sets forth the standard for a trustee to avoid a "preferential" transfer of an interest of the debtor, *to wit*, in order to be so avoided, a transfer must be made on or within ninety (90) days before the date of the filing of the petition and be i) to or for the benefit of a creditor; ii) for or on account of an antecedent debt owed by the debtor before such transfer was made; or iii) made while the debtor was insolvent.

51.     In this case, payments made by Plaintiff to Careers in exchange for staffing services rendered were made for the benefit of Plaintiff's joint employees, subcontractors, contractors and/or associates who performed work for Plaintiff.[27]

52.     Payments issued to Careers by FBI were largely for employee wages and taxes…substantially for the benefit of FBI and the temporary staffing associates assigned thereto.[28]

53.     Specifically, over the course of the entire business relationship between FBI and Careers from approximately February, 2011 through December 2013, all payments made by the debtor to Careers were for the provision of employment services for workers assigned to work for the debtor at the debtor's respective locations.  All such payments were for the benefit of the debtor, governmental authorities, those employees provided to the debtor by Careers, subcontractors of CareersUSA, and Careers' subcontractor's employees provided to the debtor.[29]

---

[26] *See* Defendant's Answer and Affirmative Defenses, Affirmative Defense No. 6.

[27] *See* Defendant's Answer and Affirmative Defenses, Affirmative Defense No. 10; Affidavit of Mandy Wilson *at* Paragraph 11.

[28] *See* Affidavit of Mandy Wilson *at* Paragraph 12.

[29] *See* Affidavit of Mandy Wilson *at* Paragraph 13.

54.     Further, there are various payments in the beginning of the alleged "preference period" such as those on Exhibit A to Plaintiff's Complaint on June 13, 2013, and others towards the end of the alleged "preference period" such as those payments on June 5, 2013 and June 6, 2013, that do not appear to be within the ninety (90) day period prior to the petition date.[30]

55.     Additionally, some of the payments made by Plaintiff to Careers were not for an antecedent debt as required under 11 U.S.C. § 547(b)(2),[31] and the debtor was not insolvent at the time of the transfers in question.

56.     Consequently, the "Transfers" referenced throughout Plaintiff's Complaint are not preferential transfers because said transfers do not satisfy the requisite criteria under 11 U.S.C. § 547(b)(2) and therefore, FBI cannot avoid and recover the so-called "preferential transfers" as it seeks to do via its Complaint.

57.     Accordingly, for the reasons set forth in Section III(C) of this Motion, Careers requests that summary judgement be entered in its favor and against the Plaintiff, FBI Wind Down, Inc. Liquidating Trust, by and through Alan D. Halperin, as Liquidating Trustee.

D)      <ins>CareersUSA is Entitled to Summary Judgement Against Plaintiff on Each of Plaintiff's Fraudulent Transfer Claims Against Careers because Notwithstanding Plaintiff's Erroneous Allegations, there was Nothing Fraudulent Whatsoever with Respect to Careers' Services Rendered to FBI and the Corresponding Transfers Made by FBI in Exchange Therefore.</ins>

58.     Plaintiff's attempt to avoid transfers of interests of the entity formerly known as Furniture Brands International, Inc. also fails because the 'Transfers" referenced throughout Plaintiff's Complaint do not constitute fraudulent transfers as alleged by Plaintiff and

---

[30] *See* Affidavit of Mandy Wilson *at* Paragraph 19.

[31] *See* Defendant's Answer and Affirmative Defenses, Affirmative Defense No. 10.

consequently, may not be avoided as preferences under the Bankruptcy Code, nor recovered by Plaintiff from CareersUSA.[32]

59.     In fact, there was nothing fraudulent whatsoever about the services performed by Careers and/or the transfers Plaintiff made in exchange therefore.  Careers did not defraud nor intend to defraud FBI, nor any other entity, in connection with the services rendered by CareersUSA pursuant to the parties' Agreement as Careers always performed its obligations and accepted payments in good faith under the terms of said Agreement.[33]

60.     The 'Transfers" referenced throughout Plaintiff's Complaint do not satisfy or even come close to satisfying the requisite standard to be considered a "fraudulent transfer."

61.     United States Code § 548(a)(1) provides that a trustee may only avoid an alleged fraudulent transfer of an interest in property or other obligation incurred by the debtor, within two (2) years before the petition date, if the debtor:

> (A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or
>
> (B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
>
> (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
>
> (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;
>
> (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or

---

[32] See Defendant's Answer and Affirmative Defenses, Affirmative Defense No. 7.

[33] See Defendant's Answer and Affirmative Defenses, Affirmative Defense Nos. 7 & 8.

(IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

62.     "The trustee has the burden of establishing each of the elements of a fraudulent transfer claim…This burden of proof never shifts." *See Pension Transfer Corp. v. Beneficiaries Under Third Amendment to Fruehauf Trailer Corp. Retirement Plan No. 003*, 319 B.R. 76, 84 (Bankr. D. Del. 2005) (*citing In re R.M.L., Inc.*, 92 F.3d 139, 144 (3d Cir.1996)).

63.     In this case, the debtor did not make any transfers to Careers with the "actual intent to hinder, delay, or defraud Careers", nor did the debtor "receive[] less than a reasonably equivalent value in exchange for such transfer or obligation."

64.     An analysis as to whether or not the transfers in questions were fraudulent must necessarily cease once it is determined that said transfers do not satisfy the criteria set forth in 11 U.S.C. § 548(a)(1)(A) and (B)(i), as is the case here.

65.     Stated another way, FBI's fraudulent transfer claims against Careers[34] fail as a matter of law, and were seemingly plead by Plaintiff merely to maintain some cause of action against Careers in the event Plaintiff's preference claims fail.

66.     Accordingly, the transfers in question do not constitute fraudulent transfers as alleged by Plaintiff and may not be avoided under the Bankruptcy Code, nor recovered by Plaintiff from CareersUSA.  Summary judgement should be entered in favor of CareersUSA and against the Plaintiff, FBI Wind Down, Inc. Liquidating Trust, by and through Alan D. Halperin, as Liquidating Trustee.

---

[34] *See* Plaintiff's Complaint, Second and Fourth cause of action.

IV.     **Conclusion**

At all times relevant hereto, CareersUSA performed its obligations and accepted payments in good faith pursuant to the terms of the Temporary Labor Services Agreement by and between CareersUSA and the entity formerly known as Furniture Brands International, Inc. (now Plaintiff, FBI Wind Down, Inc.).  As explained in detail in Section III(A) above, notwithstanding the erroneous and misguided allegations in Plaintiff's Complaint, the Plaintiff may not avoid any transfers of interests of the entity formerly known as Furniture Brands International, Inc. ("FBI") because all such transfers took place in the ordinary course of business or financial affairs of the debtor, FBI, and the transferee, CareersUSA.  Further, as set forth in Section III(B) of this Motion, Plaintiff may also not avoid any transfers of any interests of FBI because such transfers were intended by CareersUSA and FBI to be a contemporaneous exchange for new value provided by CareersUSA to the debtor.  Section III(C) of this Motion details  how the Plaintiff may not avoid any transfers of interests of FBI because the "Transfers" referenced throughout Plaintiff's Complaint are not preferential transfers as alleged and consequently, may not be avoided as preferences under the Bankruptcy Code, nor recovered by Plaintiff from CareersUSA. Lastly, as set forth in Section III(D) of this Motion, CareersUSA is entitled to summary judgement against Plaintiff on each of Plaintiff's fraudulent transfer claims against Careers because notwithstanding Plaintiff's erroneous allegations, there was nothing fraudulent whatsoever about the services performed by Careers and/or the transfers Plaintiff made in exchange therefore; Careers did not defraud nor intend to defraud FBI, nor any other entity, in connection with the services rendered by CareersUSA pursuant to the parties' Agreement.  CareersUSA is entitled to retain any and all payments received in good faith from FBI in consideration for the temporary staffing services rendered by CareersUSA to FBI.  Plaintiff's attempt to avoid and recover

preferential transfers must be rejected as a matter of law, and summary judgment should be entered in CareersUSA's favor accordingly.

WHEREFORE, Defendant, Careers USA, Inc. a/k/a CareersUSA, respectfully requests this Court enter an Order granting this Motion for Summary Judgement in favor of Defendant and against the Plaintiff, FBI Wind Down, Inc. Liquidating Trust, by and through Alan D. Halperin, as Liquidating Trustee.

Dated:  July 30, 2018.

        Respectfully submitted,

        Careers USA, Inc.

        /s Jennifer O. Johnson
        By: Jennifer O. Johnson, Esq.
        Careers USA, Inc., General Counsel
        6501 Congress Avenue, Suite 200
        Boca Raton, Florida 33487
        Tel. 561.995.7000
        Fax. 561.995.8300

        Timothy J. Weiler, Esq. (Delaware Bar No. 002363)
        716 North Tatnall Street
        Wilmington, Delaware 19801
        Tel. 302.658.6900
        Fax. 302.510.6125

# FurnitureBrands

## TEMPORARY LABOR SERVICES AGREEMENT

**THIS SERVICES AGREEMENT** (this "Agreement"), is entered into this 2nd day of  March , 2011, by and between Furniture Brands International , Inc. ("FBN"), a Delaware corporation ("Buyer"), having its principal place of business at 1 North Brentwood Blvd., St. Louis, MO 63105, U.S.A., acting as buying agent for its Affiliates (as defined below) and CareersUSA, a Florida corporation ("Contractor"), having its principal place of business at  6501 Congress Ave, Suite 200, Boca Raton, FL.

**Witnesseth**. Whereas, FBN Affiliates (as defined below) are engaged in the manufacturing, distribution, marketing, and sale of residential furniture, home accessories and related products on a world-wide basis; Whereas, FBN assists such Affiliates with manufacturer selection, purchasing, production scheduling, quality control, and transportation and logistics management; Whereas, FBN as buying agent for its Affiliates setting forth the general terms and conditions of their relationship that will apply to any future purchase of Manufacturer's products by FBN Affiliates;

**Preliminary Statement** Buyer desires to engage Contractor to provide Temporary Labor Services in support of Buyer's business and Contractor desires to provide such services to Buyer.

**NOW, THEREFORE,** in consideration of the foregoing, the agreements, covenants and payments hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

**1. SCOPE OF WORK.**   Buyer hereby engages Contractor to provide, and Contractor hereby agrees to provide Buyer those services set forth below and in Schedule 1, which is attached hereto and incorporated herein by reference.

### Duties of Contractor

a. **Provision of Staffing Services**.  Contractor will recruit, interview, screen and assign to Buyer Contractor's employees ("Assigned Employees") who, in Contractor's judgment, are best qualified to perform the type of work described on Schedule 1.  The Assigned Employees will perform the work for Buyer at the locations within the United States specified on Schedule 1. Contractor will provide these staffing services in accordance with the terms of this Agreement and specifically will assume responsibility for the following:  maintaining personnel and payroll records; paying, withholding and transmitting payroll taxes; making unemployment contributions; handling unemployment and workers' compensation claims involving Assigned Employees with respect to compensation that Contractor has agreed to pay; and removing any Assigned Employee at the request of Buyer, provided there is a valid legal reason for doing so.

b. **Screening and Background Checks**.  To the extent permitted by applicable law, Contractor will screen and perform the specific background checks and tests set forth on Schedule 2, including criminal background checks, on all Assigned Employees placed at Buyer, the actual cost of which will be covered by the Contractor as a part of the agreed to mark-up rates (Schedule 2).

c. **Guarantee**.  In the event that Buyer is not satisfied with the performance of any Assigned Employee, then, upon Buyer's request, Contractor will remove the Assigned Employee with whom Buyer is not satisfied from assignment, relieve Buyer of the obligation to pay for the first

Exhibit A

# FurnitureBrands

four (4) hours of the Assigned Employee's assignment, provided Buyer notifies Contractor of its dissatisfaction within the first four (4) hours of the Assigned Employee's assignment, and use its best efforts to provide a replacement Assigned Employee as soon as practicable.

d. **Employee Waiver.** It is agreed that Assigned Employees will not be entitled to holidays, vacations, disability, insurance, pensions or retirement plans, or any other benefits offered or provided by Buyer to its staff employees; Contractor will require Assigned Employees to sign an employment agreement including language consistent with the foregoing, a copy of which is available upon request.

e. **Reporting Requirement.** Contractor is required to provide FBN with the following information on a monthly basis:

1) Spend – by person, by location, and by function
2) The names of all the temps, their job titles and their start and end dates of every assignment
3) Mark up rates, hourly pay rates and bill rate for each employee.

## Duties of Buyer

a. **Supervision of the Work.** Notwithstanding the presence of any Contractor personnel at a facility where Assigned Employees are placed under this Agreement, Buyer agrees to supervise and control the work, premises, processes and systems to be performed by Assigned Employees and to review and approve the corresponding work product. In addition, Buyer will control the development, quality and implementation of the work product. In the event Buyer is dissatisfied with the work product produced in whole or in part by any Assigned Employee, Buyer may request, and its sole remedy will be, the removal of such Assigned Employee in accordance with Section 1(c).

b. **Provision of Equipment and Supplies.** Buyer shall provide all Assigned Employees with all equipment, facilities and supplies reasonably necessary for them to perform their duties hereunder.

c. **Buyer-specific Training.** Buyer shall train Assigned Employees with regard to all Buyer policies and procedures that may be adopted or implemented from time to time which, in Buyer's judgment, will allow Assigned Employees to successfully perform their specific job duties.

d. **Notification of Complaints and Incidents.** Buyer agrees to immediately inform Contractor of all formal and informal complaints, allegations or incidents of any Assigned Employee misconduct or workplace safety violation of which it becomes aware, regardless of the source, including, but not limited to, allegations of sexual harassment, discrimination, violations of the Occupational Safety and Health Act, violations of the Health Insurance Portability and Accountability Act or threats of violence. To the extent commercially reasonable, Buyer shall provide a complete and accurate disclosure of all circumstances surrounding such matters.

# FurnitureBrands

**Mutual Duties**

a. **Permits and Licenses.** Contractor will maintain in effect during the term of this Agreement any and all federal, state and/or local licenses and permits which may be required of staffing employers generally. Buyer will maintain at its expense such licenses and permits as may be required by applicable authorities in order to engage in Buyer's business, and if Contractor is requested to obtain these types of permits and/or licenses on behalf of Buyer, the cost thereof will be billed to Buyer.

b. **Cooperation.** The parties agree to cooperate fully and to provide assistance to each other in the investigation and resolution of any complaints, claims, actions or proceedings which may be brought by or involve any Assigned Employee.

c. **Notification of Accidents.** Contractor will provide workers' compensation insurance coverage for Assigned Employees. The parties agree to immediately notify each other of any injury or accident occurring while Assigned Employees are performing work for Buyer and any claim for workers' compensation benefits involving Assigned Employees.

d. **Safety and OSHA Compliance.** Buyer will provide all Assigned Employees with a safe worksite and will provide information, training and safety equipment with respect to any hazardous substances or conditions to which Assigned Employees may be exposed at the worksite, whether or not required by law. Without limiting the generality of the foregoing, because Buyer controls the facilities in which Assigned Employees work, it is agreed that Buyer is primarily responsible for compliance with the Occupational Safety and Health Act and comparable state laws and regulations thereunder, to the extent those laws apply to Assigned Employees assigned to Buyer's facilities. Contractor will, at the request of Buyer, instruct its employees on general safety matters in accordance with information provided to Contractor by Buyer.

e. **Confidentiality.** Both parties acknowledge that they may receive information which is proprietary to or confidential to the other party or its affiliated companies and their Buyers. Both parties agree to hold such information in strict confidence and not to disclose such information to third parties or to use such information for any purpose whatsoever other than performing hereunder or as required by law. Contractor will require Assigned Employees that work in Clerical or Professional Roles upon request to sign Buyer's standard confidentiality agreement, a copy of which is attached hereto as Exhibit 3.

f. **Compliance with Law.** Contractor shall comply with all applicable national, state and local laws and regulations governing the provision of staffing services and Contractor's business generally. Buyer shall comply with all applicable national, state, and local laws and regulations governing the work product, performance of work by Assigned Employees and the Buyer's business generally.

# FurnitureBrands

**2. PRICE AND PAYMENT**. Buyer agrees to pay Contractor for services rendered according to the rates set forth in Schedule 2. When the Work is completed according to the terms and conditions hereof, Contractor shall submit a proper invoice in a form satisfactory to Buyer, and within sixty (60) days after receipt of such invoice Buyer shall pay to Contractor any undisputed amounts. Disputed amounts will be paid, if owed, within thirty (30) days of resolution of the dispute; however, Buyer must notify Contractor in writing of any disputed amount within five (5) days after Buyer's receipt of invoice. Contractor shall bill Buyer for such compensation not more frequently than weekly.

   a. **Payment for Overtime**. The pricing provided in Schedule 2 does not contemplate non-exempt Assigned Employees (as "non-exempt employee" is defined in the Fair Labor Standards Act or relevant state law) working overtime. If such Assigned Employees work more than forty (40) hours in any one work week, Contractor will be paid for the additional hours at a rate of one and one-half times the Assigned Employee's straight-time bill rate. The overtime rate will also apply, when required by a government contract or applicable law or regulation, for work in excess of eight (8) hours in any one day. In jurisdictions in which other overtime or double-time obligations are imposed by statute or regulation, Contractor will bill at the bill rate for overtime that Contractor must pay its employees.

   b. **Reimbursement for Expenses**. In the event that an Assigned Employee is required to incur business and/or travel expenses, such expenses, if approved by Contractor, will be paid by Contractor and reimbursed to Contractor by Buyer at Contractor's actual cost.

   c. **Sales Tax**. Any sales, use, excise or other such tax levied as a result of performance hereunder will be paid by Buyer.

   d. **Conversion During Agreement**. During the term of this Agreement, in the event Buyer hires as an employee any Assigned Employee, engages as an independent Contractor any Assigned Employee, or permits to transfer to another entity's payroll in order to perform services for Buyer or at Buyer's facilities any Assigned Employee, Buyer will pay to Contractor within 30 days from receipt of invoice the conversion fee as set forth on Schedule 2. Buyer will require converted employee to sign a release and for Contractor to transfer Drug and Background screen to Buyer is converted within six (6) months of work start. However, Buyer may not directly or indirectly hire, utilize, assign or employ any Assigned Employee unless all outstanding Buyer invoices are paid in full prior to such hire or employment.

**3. TERM**. Work shall begin at the premises/location, set forth in Schedule 1, on or before February 1st, 2011 and shall be completed on or before January 31, 2013, unless sooner terminated by the parties according to the terms and conditions set forth herein.

   a. **Termination for Convenience**. Either party may terminate this Agreement for any reason upon thirty (30) days' written notice to the other party (also see Schedule A).

   b. **Termination for Cause**. See Section 4 below.

**4. NO GUARANTEE OF USAGE**. The annual temporary labor hours contained herein represent an estimate of FBN's annual usage requirements. FBN does not make any guarantee of the annual hours that will be required of the Contractor over the life of this contract. Contractor will be the temporary

# FurnitureBrands

labor service provider of choice for all locations listed in Schedule 1.  Under this agreement, Buyer will only seek a secondary source of temporary labor under the following conditions:

    a.    Upon the Contractor's failure to provide requested staffing in the time frame set forth below, Buyer will have the option to seek the desired help from a secondary source of temporary labor.

| | | |
|---|---|---|
| 1) | Admin/Clerical | Available for work by the morning of the 3rd business day |
| 2) | Industrial/Manufacturing | Available for work by the morning of the 2nd business day |
| 3) | Professional | Candidates  in for interview by the morning of the 4th business day |

    b.    If the Contractor fails to provide temporary staff that can perform the required job functions, the Buyer will have the option to transition all or a part of the business to a secondary source of temporary labor.  The Contractor will be given reasonable notice and a fair amount of time to rectify any deficiencies as agreed to by both parties.

    c.    To ensure adherence to the terms of this Agreement, Buyer will perform regular audits of mark-up rates, background check requirements, drug screening requirements, and other terms of this Agreement.  If deficiencies are discovered, the Buyer will notify the Contractor and allow ample time to correct any deficiencies.  If the Contractor fails to correct these deficiencies in the agreed upon time frame, the Buyer will have the option to transition all business to the secondary source of temporary labor.

    d.    Before business can be completely transitioned over to a secondary source, approval must be given by FBN Corporate HR management.  Buyer will notify Contractor in advance of any decisions to transition the business to the secondary source.

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the date first above written.

**BUYER:**                                                                                  **CONTRACTOR:**

**Furniture Brands International**                              **CareersUSA**
By:                                                                                          By: _____

Name: _____                        Name: _Heather Bellucci_

Title: _____                         Title: _Dir. of Nat'l Accts._

# FurnitureBrands

## Schedule 1
## Job Descriptions and Locations

Summary:

| LOT | LOT NAME | NUMBER OF POSITIONS | NUMBER OF PEOPLE | ESTIMATED ANNUAL HOURS |
|---|---|---|---|---|
| 4 | LOT 4 - Corp Shared Services STL, MO | 2 | 3 | 2,000 |
| 8 | LOT 8 - Las Vegas, NV | 2 | 2 | 322 |

**Note**: *The above represents an estimate of annual temp labor hours needed.  FBN does not guarantee the hours listed above.*

*Original Cost Breakdown / SOW Detail Submitted by Vendor:*

| SITE | Address (including City, State, Zip) | POSITION CATEGORY | JOB TITLES | NUMBER OF PEOPLE | TOTAL ANNUAL HOURS | STRAIGHT TIME PAY RATE | STANDARD MARK-UP (%) | BILL RATE | EXTENDED ANNUAL BILL AMOUNT | BILL RATE | EXTENDED ANNUAL BILL AMOUNT (U.S. Dollars) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **LOT 4 - Corp Shared Services STL, MO** | | | | | | | | | | | |
| STL | 1 N. Brentwood, Clayton, MO | Clerical | Accounts payable clerk | 1 | 480 | 16 | 32.00% | 21.12 | 10,137.60 | 30.00% | 20.80 | $ 9,984.00 |
| STL | 1 N. Brentwood, Clayton, MO | Professional | Staff Accountant | 1 | 480 | 25 | 32.00% | 33.00 | 15,840.00 | 30.00% | 32.50 | $15,600.00 |
| STL | 1 N. Brentwood, Clayton, MO | Professional | Staff Accountant | 1 | 1040 | 30 | 32.00% | 39.60 | 41,184.00 | 30.00% | 39.00 | $40,560.00 |
| | | | | | | | | **LOT 4 TOTAL** | 67,161.60 | **LOT 4 TOTAL** | 66,144.00 |
| **LOT 8 - Las Vegas, NV** | | | | | | | | | | | |
| Broyhill - Las Vegas Show room | WMC, 1053A, 495 S. Grand Cntrl Pkwy, Las Vegas, NV  89106 | Professional | Interior Designer | 1 | 160 | 44 | 32.00% | 58.08 | 9,292.80 | 30.00% | 57.20 | $ 9,152.00 |
| Broyhill - Las Vegas Show room | WMC, 1053A, 495 S. Grand Cntrl Pkwy, Las Vegas, NV  89106 | Light Industrial | General Labor | 1 | 162 | 12 | 36.00% | 16.80 | 2,560.12 | 34.00% | 15.57 | $ 2,522.47 |
| | | | | | | | | **LOT 8 TOTAL** | 11,852.92 | **LOT 8 TOTAL** | 11,674.47 |

# FurnitureBrands

## SCHEDULE 2
## PRICES/RATES

**Rate Summary**

| LOT NAME | Position Category | Standard Mark-up Rate | Payroll Mark-up Rate | Payment Terms | SUPPLIER'S BID (in U.S. Dollars) | Status |
|---|---|---|---|---|---|---|
| LOT 4 - Corp Shared Services STL, MO | Clerical | 32.00% | 30.00% | Net 60 | $10,138 | Awarded |
| LOT 4 - Corp Shared Services STL, MO | Professional | 32.00% | 30.00% | Net 60 | $57,024 | Awarded |
| LOT 8 - Las Vegas, NV | Professional | 32.00% | 30.00% | Net 60 | $9,293 | Awarded |
| LOT 8 - Las Vegas, NV | Light Industrial | 36.00% | 34.00% | Net 60 | $2,560 | Awarded |

*Reference the above Original Final Cost Breakdown submitted by CareersUSA. Rates are applicable for all job categories (Schedule 1) and locations listed above.*

| INITIAL HIRING FEES | |
|---|---|
| CRIMINAL BACKGROUND CHECK (per Check) | Included in Mark-up |
| TEN PANEL DRUG TEST (per Test) | Included in Mark-up |
| OFAC CHECK (per Check) | $5.00 |
| HOMELAND SECURITY CHECK (per Check) | $5.00 |
| EDUCATIONAL BACKGROUND VERIFICATION (per Check) | $10.00 |
| e-VERIFICATION (per Check) | No charge |
| OTHER (per Individual or per Check) - Please Specify | |
| TOTAL | $20.00 |

| TENURE DISCOUNT | |
|---|---|
| TENURE (MONTHS) | % DISCOUNT TO MARK-UP |
| > 3 Mo. - 6 Mo. | 0.00% |
| > 6 Mo. - 9 Mo. | 0.25% |
| > 9 Mo. - 12 Mo. | 0.50% |
| > 12 mo. | 0.75% |

| OTHER FEES | | | | |
|---|---|---|---|---|
| OVERTIME RATE MARK_UP PERCENTAGE | | | | |
| TIME PERIOD FOR APPLICATION OF CONVERSION FEE | 0 - 30 days | 31-60 days | 61-90 days | 91 days+ |
| CONVERSION FEE (per Individual) | 15.00% | 12.00% | 10.00% | 8% and 0 after 119 days |
| DIRECT HIRE FEE FOR PAYROLL ONLY EMPLOYEES (per Individual) | 0.00 | | | |

| | Fee (As a % of Candidate's 1st year salary) |
|---|---|
| 1. Direct Placement Rates | 15% |

| | Mark-up % |
|---|---|
| 2. Payrolling Rates | Clerical 30% LI 34% |

| VOLUME DISCOUNT | |
|---|---|
| TOTAL SPEND RANGE | % of Total Spend |
| <$500K | 0.00% |
| $500-$1M | 0.25% |
| $1M-$2M | 0.30% |
| $2M-$3M | 0.40% |
| $3M-$4M | 0.50% |
| $4M-$5M | 0.65% |
| $5M-$6M | 0.75% |

**Vendor Notes/Comments:**

Drug and Background checks are included in the bill rates quoted. FBN will not be billed

# FurnitureBrands

sperately for these services.

**Background Checks and Testing Requirements**

| Check or Test | Specific Requirements, If Any | Cost |
|---|---|---|
| National Criminal Background Check | Required by Furniture Brands International for all Assigned Employees | Included in Mark-up Rate |
| Drug Tests | Required by Furniture Brands International for all Assigned Employees | Included in Mark-up Rate |
| eVerification Check | Required by Furniture Brands International for all Assigned Employees | No charge |
| Driving Record Check | Required upon request by Furniture Brands | Billed to Buyer at Contractor Cost |
| Credit Check | Required upon request by Furniture Brands | Billed to Buyer at Contractor Cost |
| Education Verification | Required upon request by Furniture Brands | Billed to Buyer at Contractor Cost |
| Health Compliance | Required upon request by Furniture Brands | Billed to Buyer at Contractor Cost |

# FurnitureBrands

## TERMS & CONDITIONS

1. **CONTRACT**: These Terms and Conditions and the Service Agreement, together with any Schedules, specifications or drawings referred to herein shall constitute the entire agreement between the parties (the "Agreement") for the services and material provided by Contractor to Buyer pursuant to this Agreement (the "Work"). Buyer objects to and shall not be bound by any past or future terms and conditions or course of conduct not set forth herein, unless set forth in writing and signed by an authorized representative of Buyer. Any additional or inconsistent terms not so agreed by Buyer in writing shall be null and void. Acceptance of any quotation, acknowledgment, confirmation order, work order, invoice or other form shall not modify the terms of this Agreement. No claims for changes or extras will be permitted for work or materials and no change in price shall be allowed unless approved in writing by Buyer in advance.

2. **PERFORMANCE**: TIME IS OF THE ESSENCE IN THE PERFORMANCE OF THIS AGREEMENT. Without limiting the foregoing, Contractor agrees to use its best efforts to complete the Work by the end date specified by Buyer and in accordance with any schedule specified by Buyer. Contractor warrants that (i) it and all subcontractors hired by Contractor (as permitted in Section 4) will perform all Work in a good and workmanlike manner, (ii) all Work, including all materials and equipment furnished hereunder, shall conform to all requirements and specifications identified in this Agreement or provided to Contractor by Buyer pursuant to this Agreement and all industry standards established by those engaged in a business similar to that of Contractor, and (iii) all Work shall be free from defects of any kind in materials and workmanship.

3. **INDEPENDENT CONTRACTOR**: Contractor shall assume all duties under this Agreement as an independent contractor, and shall not be deemed for any purpose to be an agent, servant or representative of Buyer. Buyer shall have no direct control of Contractor, its agents or subcontractors in the performance of the Work. Nothing contained herein shall be construed to be inconsistent with such independent contractor relationship.

4. **ASSIGNMENT; SUBCONTRACTORS**: Contractor shall not assign, sublet, or subcontract any portion of the Work without the prior written consent of Buyer. If permitted to subcontract Work pursuant to this Section, Contractor shall be fully responsible for all work and services performed and materials provided by subcontractors. Contractor agrees that Buyer reserves the right to approve or reject any subcontractor.

5. **LIABILITY AND INDEMNITY**: CONTRACTOR SHALL BE SOLELY RESPONSIBLE FOR ALL LABOR, MATERIALS, EQUIPMENT AND WORK UNTIL THE JOB IS ACCEPTED BY BUYER. Contractor will indemnify and hold harmless Buyer and its respective successors and assigns against any and all suits, losses, damages, liabilities, costs and expenses (including reasonable attorneys' fees and other costs of defending any action) ("Losses") which such parties may sustain or incur in connection with (a) a breach of any representation, warranty, or undertaking made by Contractor in this Agreement or such parties' enforcement of this Agreement, or (b) as a result of any suit, claim or demand based upon any legal theory, including, without limitation, negligence, breach of warranty or strict liability in tort in connection with the Work performed or provided hereunder, except to the extent caused by Buyer, or (c) as a result of any suit, claim, or demand under any environmental, health or safety laws, rules, regulations or requirements, including, without limitation the Comprehensive Environmental Response Compensation Liability Act, 42 U.S.C. § 9601 et seq, as amended, in connection with the Work performed or provided hereunder. If Contractor's performance requires Contractor, its employees, agents or representatives to perform services or labor in the plants or on the premises of

# FurnitureBrands

Buyer, its agents, customers, or users, Contractor agrees to indemnify and hold harmless Buyer against all suits, losses, claims, damages, liabilities, costs and expenses for injury or damage to person or property arising out of such performance, except to the extent caused by Buyer. Contractor agrees that it will, when requested and given reasonable notice of the pendency of any such suits, claims or demands, assume the defense of Buyer and its respective successors and assigns against any such suits, claims or demands.

6. **INSPECTION OF PREMISES/LOCATION:** Contractor acknowledges that it has examined and is familiar with the premises/location upon which the Work is to be performed and knows the premises/location of the Work, the areas that will be assigned to it for its use, the configuration of the ground, the difficulties and potential hazards attending the execution of the Work, the general and local labor conditions and all other matters which can in any way affect the execution or safety of the Work.

7. **USE OF PREMISES/LOCATION/SECURITY:** Contractor shall perform all Work hereunder in such a manner as to cause a minimum of interference with Buyer's existing operations and the operations of other contractors on Buyer's premises/location. Contractor shall comply with all Buyer's security regulations to gain entrance on Buyer's property. Contractor will ensure as a condition of employment with Contractor, that Contractor's employees will cooperate with any security or other investigation, and at the request of Buyer, submit to any reasonable security tests or checks. Contractor shall perform criminal background checks and drug testing (i) upon hiring of all employees hired to perform the Work and (ii) within the previous two (2) years on all current employees assigned to perform Work. Upon completion of the Work, Contractor shall restore the premises/location to its original condition and leave said premises/location clean and free of all tools, equipment, waste materials and rubbish. It is agreed that Contractor shall not be entitled to damages for delays regardless of cause including site conditions, weather, or acts or omissions of Buyer or other contractors or vendors.

8. **INSURANCE:** Prior to performing the Work under this Agreement, Contractor shall furnish to Buyer Certificate(s) of Insurance evidencing compliance with attached <u>Schedule 3</u>: Vendors Insurance Requirements.

9. **PAYMENT OF BILLS AND LIENS:** Contractor shall pay promptly all indebtedness for labor, materials, tools, and equipment used in the performance of this Agreement. Before Contractor shall be entitled to receive payment, Contractor shall furnish evidence satisfactory to Buyer of the full payment of any such indebtedness. If any lien shall attach to premises/location of Buyer as a result of the Work performed, Contractor shall promptly procure its release and hold Buyer harmless from all loss, cost, damage, or expense incidental thereto. Contractor hereby authorizes Buyer to pay any such liens from any payments due Contractor. To the extent permitted by law, Contractor waives and hereby releases Buyer and the premises/location of Buyer from any and all liens accrued or accruing to it whatsoever and authorizes Buyer to withhold payments due Contractor for the applicable statutory period to pay any liens arising from the Work for which Contractor has failed to provide evidence satisfactory to Buyer of full payment of such indebtedness.

10. **TAXES:** Contractor shall accept sole liability for, and pay, all taxes, assessments, excises, impositions, licenses and fees (including interest or penalties, if any) levied, assessed, or imposed upon or on account of the execution of the Work under this Agreement or its receipts therefrom or on the materials therefor or on the manufacture, storage, sale, receipts from sale, use, transportation, inspection, or delivery of the materials therefor under any federal, state or local law or laws. When required to do so by law, Buyer shall have the right to withhold state taxes, and pay such taxes to the state, or to delay payment, up to the amount of the tax. Contractor hereby accepts exclusive liability for withholding requirements, payroll taxes, Unemployment Taxes, Federal Insurance Contributions Act Taxes and all state taxes relating to unemployment compensation laws as well as all interest and penalties provided for in such laws, or in any similar laws which may hereafter be enacted, with respect to the wages and salaries paid to Contractor's employees for services rendered in connection with this Agreement.

11. **PATENTS:** CONTRACTOR AGREES TO PROTECT, INDEMNIFY, AND HOLD HARMLESS BUYER AND ITS SUCCESSORS IN INTEREST FROM AND AGAINST ALL CLAIMS, SUITS, JUDGMENTS, COURT COSTS, ATTORNEY'S FEES, AND OTHER LIABILITIES, DEMANDS, OR LOSSES IN ANY MANNER ARISING OUT OF INFRINGEMENT OR ALLEGED INFRINGEMENT OF ANY PATENT BECAUSE OF THE PERFORMANCE OF ANY WORK BY CONTRACTOR HEREUNDER, OR BECAUSE OF THE POSSESSION, USE, OR SALE OF ANY STRUCTURE, APPARATUS, MATERIAL, OR OTHER THING FURNISHED BY CONTRACTOR HEREUNDER, PROVIDED THAT

# FurnitureBrands

CONTRACTOR SHALL BE NOTIFIED PROMPTLY OF THE BRINGING OF ANY SUCH SUITS.

12. **AUDIT**: Except for lump-sum contracts, Buyer may, upon request, audit any and all records of Contractor and any of its subcontractors relating to Work performed hereunder; provided, however, Contractor and subcontractors shall have the right to exclude any trade secrets, formulas, or processes from such inspection. Contractor further agrees to maintain its books and records and to cause its subcontractors to maintain their books and records relating to Work performed hereunder for a period of two (2) years from the date such Work was completed and to make such books and records available to Buyer at any time or times within the two-year period.

13. **DISPUTES**: This Agreement shall be construed in accordance with the laws of the State of Missouri, without giving effect to the choice or conflicts of laws provisions thereof. Contractor and Buyer agree that all litigation between the parties arising out of this Agreement shall be tried in the State where the Buyer plant is located. The parties further agree that before any such litigation is filed, a good faith effort shall be made to resolve any such disputes by authorized officers or representatives of the parties on a without prejudice basis.

14. **CONFLICT OF INTEREST**: Contractor warrants that it has not given nor received any commissions, payments, gifts, kickbacks, lavish or extensive entertainment or other things of value in connection with this Agreement and acknowledges that the giving or receiving of any such payments, gifts, entertainment, or other things of value is strictly in violation of Buyer's corporate policy and may result in the cancellation of this and all future contracts. Contractor shall notify Buyer's security department of any such solicitation by any of Buyer's employees or agents.

15. **COMPLIANCE WITH LAWS; PERMITS**. Contractor will obtain and keep current at its expense all governmental permits, certificates and licenses (including professional licenses, if applicable) necessary for Contractor to perform Work. All Work under this Agreement shall be furnished or performed in full and complete compliance with all applicable federal, state, county and local laws, ordinances, regulations and codes (including without limitation the Federal Clean Air Act, Clean Water Act, Toxic Substances Control Act, Safe Drinking Water Act, Resource Conservation and Recovery Act, Comprehensive Environmental Response Compensation and Liability Act and the Fair Labor Standards Act.) Contractor expressly agrees not to discriminate against any employee or applicant for employment because of race, color, religion, sex, national origin, age or disability, and shall during the performance of this Agreement comply with all applicable federal, state and local equal employment laws, including, but not limited to, all EEOC regulations. Contractor will not knowingly employ an unauthorized alien and agrees at all times to remain in strict compliance with all terms, provisions, regulations and rulings relative to the Immigration Reform and Control Act of 1986. Contractor agrees that the clauses identified below are herein incorporated by reference to the extent Buyer determines they are required by law to be so incorporated: (1) Applicable regulations found in 41 CFR Chapter 60 issued pursuant to Executive Order 11246 (Equal Employment Opportunity), Vietnam Era Veterans Readjustment Assistance Act of 1972, Rehabilitation Act of 1973; (2) Section 1-1310-2 of the Federal Procurement Regulations relating to Minority Business Enterprises; (3) 40 CFR Part 15, requiring compliance with the Clean Air Act (42 U.S.C. 7401 et seq.) and the Federal Water Pollution Control Act (33 U.S.C. 1251 et seq.), as amended; and (4) any other applicable federal regulation adopted pursuant to applicable laws.

16. **SAFETY PROVISIONS**: It is the essence of this Agreement that all Work to be performed by Contractor shall be done in a safe and good workmanlike manner, free of any accidents. Accordingly, Contractor shall promulgate, maintain, and enforce appropriate safety and health rules and procedures (including training) with respect to its personnel and the Work to be performed hereunder, which rules and procedures at a minimum shall be the equivalent of or exceed applicable Buyer safety and health rules. All work performed hereunder shall fully comply with all lawful governmental safety and health requirements, including the rules and standards established by the Occupational Safety and Health Act of 1970 ("OSHA"), as amended, and any other applicable federal, state and/or local safety or health laws, rules or regulations. Any equipment provided by Buyer to Contractor for the benefit of Contractor's employees or those of its subcontractors shall be at the sole risk and liability of Contractor to make sure that such equipment is fit for the use intended and is in proper working order. CONTRACTOR AGREES TO INDEMNIFY (INCLUDING ATTORNEYS' FEES) DEFEND, AND SAVE HARMLESS BUYER FROM ANY AND ALL CLAIMS OF CONTRACTOR, SUBCONTRACTORS, AND THEIR EMPLOYEES ARISING OUT OF THE USE OF ANY EQUIPMENT FURNISHED BY BUYER OR ADVICE GIVEN BY BUYER RELATING TO SUCH EQUIPMENT, TO THE FULLEST EXTENT ALLOWED BY LAW, IT BEING

# FurnitureBrands

UNDERSTOOD THAT BUYER SHALL NOT BE LIABLE UNDER LAW, CONTRACT, NEGLIGENCE, STRICT LIABILITY, OR OTHERWISE. Contractor shall maintain a drug and alcohol free workforce at all times while on Buyer's premises/location. Upon Buyer's request, Contractor shall provide Buyer with a copy of all accident reports prepared by or submitted to Contractor, including all OSHA illness and injury reports.

17. **RIGHT OF TERMINATION:** Without limitation or waiver of any of Buyer's rights elsewhere set forth in this Agreement, Buyer reserves the right, with or without cause, to stop the Work of Contractor and/or its subcontractors at any time and, in addition thereto, to immediately terminate this Agreement without liability, provided, in the case of Buyer's termination of this Agreement with or without cause, Buyer agrees to pay pro rata for Work already performed without any extra costs to Buyer for dismantling or removal charges. Buyer may cancel this Agreement in its entirety prior to the commencement of any Work hereunder without liability except for any actual expenses incurred in preparation specifically for Work under this Agreement.

18. **FORCE MAJEURE:** Neither party shall be liable for delays caused by unforeseen conditions beyond such party's reasonable control, including strikes, provided notice thereof is given to the other party as soon as practicable but no later than 48 hours after the start of the event causing the delay. All such conditions preventing performance shall be remedied as soon as possible, except that the settlement of strikes shall be at the discretion of the party so affected. Buyer reserves the right to terminate this Agreement should such delays, in Buyer's sole judgment adversely affect Buyer, time being of the essence to this Agreement. Nothing contained in this paragraph shall excuse or delay the payment of any money obligations.

19. **NOTICE:** All notices hereunder shall be deemed given if delivered in writing personally or sent by certified mail, electronic transmission, telephone facsimile or telex to Buyer or to Contractor at the address set forth in this Agreement. Any notice given by certified mail shall be deemed given at the time such notice is deposited in the U. S. mail.

20. **NON-WAIVER:** Waiver of any breach or failure to enforce any of the terms or conditions of this Agreement at any time shall not limit or waive either party's rights thereafter to enforce or compel strict compliance with every term and condition of this Agreement. Course of conduct or failure to enforce shall not constitute a waiver of any written provisions of this Agreement.

21. **CONFIDENTIALITY:** This Agreement, the Work to be performed, any information (including any technical information, experience or data) regarding Buyer's products, prices, plans, programs, plants, processes, costs, equipment, operations or customers which may be disclosed to, or come within the knowledge of, Contractor, its employees and agents in the performance of this Agreement shall be deemed confidential and shall not be used by Contractor nor revealed by Contractor to any third party not necessary for the completion of the Work unless permission is first obtained in writing from Buyer.

22. **WORK PRODUCT:** Contractor and Buyer each individually acknowledge and agree that all materials produced, developed, created or devised by Contractor for Buyer, including without limitation, work papers, sketches, drawings, designs, samples or models (collectively, "Work Product") shall be the sole property of Buyer. Buyer expressly acknowledges the parties' agreement that all aspects of the Work Product which may be subject to copyright protection are considered as Works Made For Hire within the meaning of the Copyright Act of 1976 (the "Copyright Act"). In the event and to the extent that the Work Product or any part thereof is found, as a matter of law, not to be a Work Made For Hire under the Copyright Act, Contractor assigns to Buyer the sole and exclusive right, title and interest in and to the Work Product without further consideration. Contractor agrees to execute, at Buyer's sole cost, any assignments, registrations, certificates or other instruments as Buyer may from time to time deem necessary or desirable to evidence, establish, maintain, perfect, protect, enforce or defend Buyer's ownership in and to any of the foregoing.

23. **SURVIVAL:** The terms of Sections 5, 9, 11, 13, 16, 21 and 22 of this Exhibit shall survive the termination, cancellation or expiration of this Agreement.

# FurnitureBrands

Schedule 3
(SERVICES)

**FURNITURE BRANDS INTERNATIONAL
VENDORS INSURANCE REQUIREMENTS
EFFECTIVE NOVEMBER 1, 2010**

**Our requirements can be generalized as follows:**
- **Per Occurrence or Combined Single Limit Amount of Coverage where applicable**

- **General and Product Liability Insurance (ISO 1986 or later)**
  $2 Million Each Occurrence
  $2 Million General Aggregate
  $2 Million Products-Completed Operations Aggregate
  > W/ Completed Operations Coverage
  > W/ Contractual Liability Coverage (or Broad Form)
  > W/ 30 Day Notice of Cancellation Clause
  > W/ Fire Legal Liability Sub-Limit (if applicable)      $100,000 (each occurrence)

- **Auto Liability Insurance**
  $1 Million  Each Accident – Combined Single Limit (Bodily Injury and Property Damage)
  > W/ Un & Under Insured Motorists & PIP Coverage

- **Workers Compensation**                                    Statutory Limit
  Also acceptable --
  Qualified Self-Insured Certificate for Workers Compensation
  Evidence of State or Provincial Compliance (such as required in Canada)
   W/ "alternate employer" endorsement for vendors located permanently on-site
  Employers Liability:
    $1 Million Bodily Injury by Accident-Each Accident
    $1 Million Bodily Injury by Disease – Each Employee
    $1 Million Bodily Injury by Disease – Policy Limit

---

**Additional requirements:**

➢ Vendor/contractor/consultant/supplier must evidence, as applicable, self-insured retentions or deductibles; and, such self-insured retentions or deductibles, exceeding $50,000, must be approved in writing by Buyer.

➢ Furniture Brands International must be added as an additional insured on vendors/contractors policy (a Blanket Additional Insured Endorsement may be acceptable.)

➢ Additional Insured Coverage should be primary and non-contributory.

➢ *Specialty vendors/contractors* are required to carry additional insurance such as **Pollution Liability Coverage, Professional Errors and Omissions** coverage or **Contractors Liability**. Please ensure that these coverages are evidenced when dealing with environmental or design/engineering vendors/contractors.  Contract Gale Smith in the Furniture Brands Risk Management Department to confirm the type of coverage, limits and retentions/deductibles required.

➢ Certificates of insurance shall be provided prior to the start of any work/services to be performed.

# FurnitureBrands

➢ Coverage shall be placed with carriers authorized to do business in the state where work/services are being performed.

➢ Carrier shall maintain an A.M. Best rating of at least an "A-" "VIII" or better, or a similar rating by another local insurance rating agency.

➢ Where the use of a subcontractor is required, the vendor/contractor/consultant/supplier shall be responsible for ensuring each subcontractor maintains insurance in conformance with the type/limits identified by Furniture Brands International.

➢ Vendors shall provide a **Waiver of Subrogation in favor of Furniture Brands International** indicating that the carriers shall waive all of its rights of recovery, under subrogation or otherwise, against Furniture Brands International, et al, and all engaged by them.

➢ General Liability (Primary & Excess) and Auto Liability policies will be written on an "occurrence" basis.

➢ Certificates must be forwarded to the Furniture Brands buyer contact or the Furniture Brands Purchasing Manager, and the Furniture Brands Risk Management Department (see below).

Furniture Brands International, Inc.
Risk Management Department
P. O. Box 1627
Tupelo, MS  38802
ATTENTION: Gale Smith
Property/Casualty Claims Specialist

Direct:  662-566-3470
Fax:  662-566-3840
gale@lanefurniture.com
Street Address:  5380 Hwy 145 South
Tupelo, MS 38801

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------------------x

In re:

FBI WIND DOWN, INC. (f/k/a Furniture
Brands International, Inc.), *et al.*,

                                           Debtors.[1]

------------------------------------------------------------------------x

FBI WIND DOWN, INC. LIQUIDATING TRUST, by and
through Alan D. Halperin, as Liquidating Trustee,

                                           Plaintiff,

    - against -

CAREERS USA, INC. a/k/a CAREERSUSA,

                                           Defendant.

------------------------------------------------------------------------x

Chapter 11

Case No. 13-12329 (CSS)

Adv. Proc. No. 15-51324
(CSS)

## AFFIDAVIT OF JOAN LASSMAN IN SUPPORT OF
## DEFENDANT'S MOTION FOR SUMMARY JUDGEMENT

STATE OF FLORIDA          )
                          ) ss
COUNTY OF PALM BEACH      )

BEFORE ME, the undersigned authority, personally appeared Joan Lassman who, being first duly sworn

under oath, deposes and says:

1.       My name is Joan Lassman. I am a resident of Palm Beach County, Florida. I am over eighteen

years of age, and I have personal knowledge of the facts stated in this Affidavit, to which I am competent

to testify.

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each debtor's tax identification number, as applicable, are: FBI Wind Down, Inc. (7683); AT Wind Down, Inc. (7587); BFI Wind Down, Inc. (3217); BHF Wind Down, Inc. (8844); BR Wind Down, Inc. (8843); BT Wind Down, Inc. (1721); FBH Wind Down, Inc. (2837); FBO Wind Down, Inc. (4908); FBRC Wind Down, Inc. (1288); HFI Wind Down, Inc. (7484); HR Wind Down, Inc. (6125); HT Wind Down, Inc. (4378); LFI Wind Down, Inc. (5064); LHFR Wind Down, Inc. (9085); LV Wind Down, Inc. (8434); MSFI Wind Down, Inc. (7486); TFI Wind Down, Inc. (6574); THF Wind Down, Inc. (3139); and TR Wind Down, Inc. (6174).

1

2.      I am a Collection Specialist for the Defendant, Careers USA, Inc. ("Careers").

3.      My job functions as a Collection Specialist, a position I have held with Careers for approximately twelve (12) years, include but are not limited to regular contact with Careers' client's accounts payables department to ensure timely receipt of payment for services rendered by Careers.

4.      I was regularly involved with the collection of funds due and owing from Furniture Brands International, Inc. ("FBI") to Careers.

5.      I would regularly contact FBI's accounts payable department to ensure that payments were forthcoming, which was my customary practice with respect to the collection of payments from FBI.

6.      At times, I would advise FBI that absent payment, Careers would necessarily have to halt the provision of its temporary employees for assignment with FBI.  This was a customary collections practice of Careers in the ordinary course of its business or financial affairs with FBI, as well as with other clients of Careers.

7.      I have reviewed Careers' internal records pertaining to payments made by FBI to Careers, the Temporary Labor Services Agreement by and between FBI and Careers, and the exhibits attached to the Plaintiff's Complaint.

8.      My review of the aforementioned records and exhibits reveal, and my personal involvement with this account serves to confirm, that payments from FBI to CareersUSA were typically made within a fifty-six (56) day timeframe, i.e. on average, there was approximately fifty-six (56) days between the invoice date and the transfer clear date.

9.      Nearly ninety percent (90%) of CareersUSA's invoices were paid by FBI within the same timeframe, i.e. payment was consistently made between twenty-four (24) and seventy-four (74) days.

10.      This recurring pattern was the usual and customary time frame for payments from FBI to CareersUSA, and this was generally consistent throughout the parties' business relationship.

11.      More specifically and in accordance with the exhibits attached to Plaintiff's Complaint, fifteen (15) of the CareersUSA invoices listed by Plaintiff in the exhibits to its Complaint were paid by FBI within twenty-four (24) to thirty (30) days from the invoice date; fifteen (15) of the invoices were paid within thirty-one (31) to forty (40) days; fifty-four (54) invoices were paid within forty-one (41) to fifty (50) days; forty-seven (47) invoices were paid within fifty-one (51) to sixty (60) days; twenty (20) invoices were paid within sixty-one (61) to seventy (70) days; and nine (9) of CareersUSA's invoices were paid by FBI within seventy-one (71) to seventy-four (74) days of the invoice date.  Again, all of these payments from FBI were consistent with the business relationship of the parties.

12.      When and if my collection efforts do not attain the desired results, it is my regular and customary practice, in the ordinary course of its business or financial affairs of Careers, to enlist the assistance of Careers' in-house legal department.

13.      I engaged Careers' legal department on at least two (2) occasions to assist in obtaining payment from FBI for staffing services rendered by Careers, which included times over a year prior to the preference period.

I say nothing further.

3

JOAN LASSMAN

BEFORE ME, the undersigned authority, personally appeared Joan Lassman, who is **personally known to me** to be the individual described herein or who has produced _____ as identification, and who executed the foregoing affidavit and who did take an oath.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal in the County and State aforesaid this 24th day of July, 2018.



JILL R MOHLER
MY COMMISSION # FF204474
EXPIRES April 12, 2019
(407) 398-0153    FloridaNotaryService.com

NOTARY PUBLIC
Name: JILL R. MOHLER
Commission or Serial No.:
My Commission Expires

4

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

-----------------------------------------------------------------------x

In re:                                                    Chapter 11

FBI WIND DOWN, INC. (f/k/a Furniture          Case No. 13-12329 (CSS)
Brands International, Inc.), *et al.*,

                        Debtors.[1]

-----------------------------------------------------------------------x

FBI WIND DOWN, INC. LIQUIDATING TRUST, by and through
Alan D. Halperin, as Liquidating Trustee,

                        Plaintiff,

         - against -
                                                    Adv. Proc. No. 15-51324    (CSS)

CAREERS USA, INC. a/k/a CAREERSUSA,

                        Defendant.

-----------------------------------------------------------------------x

**AFFIDAVIT OF MANDY WILSON IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY JUDGEMENT**

STATE OF FLORIDA                )
                                )  ss
COUNTY OF PALM BEACH            )

BEFORE ME, the undersigned authority, personally appeared Mandy Wilson who, being first duly sworn under oath,

deposes and says:

1.       My name is Mandy Wilson. I am a resident of Collier County, Florida. I am over eighteen years of age, and I

have personal knowledge of the facts stated in this Affidavit, to which I am competent to testify.

2.       I have worked for Careers USA, Inc. ("Careers") for approximately thirteen (13) years, including my

position as Careers' Vice President of Operations.

3.       As Vice President of Operations for Careers, my job duties included oversight and responsibility for

CareersUSA's branch operations, monitoring and ensuring compliance with CareersUSA's and CareersUSA's

client companies' policies and procedures, monitoring and ensuring compliance with CareersUSA contracts and

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each debtor's tax identification number, as applicable,
are: FBI Wind Down, Inc. (7683); AT Wind Down, Inc. (7587); BFI Wind Down, Inc. (3217); BHF Wind Down, Inc. (8844);
BR Wind Down, Inc. (8843); BT Wind Down, Inc. (1721); FBH Wind Down, Inc. (2837); FBO Wind Down, Inc. (4908);
FBRC Wind Down, Inc. (1288); HFI Wind Down, Inc. (7484); HR Wind Down, Inc. (6125); HT Wind Down, Inc. (4378);
LFI Wind Down, Inc. (5064); LHFR Wind Down, Inc. (9085); LV Wind Down, Inc. (8434); MSFI Wind Down, Inc. (7486);
TFI Wind Down, Inc. (6574); THF Wind Down, Inc. (3139); and TR Wind Down, Inc. (6174).

Exhibit C

audit procedures, researching and responding to Requests for Proposals, and oversight and supervision of new client implementation.

4.      I am very familiar with the staffing industry as a whole, including but not limited to the typical payment practices of clients and corresponding collection efforts of staffing firms.

5.      I also have personal knowledge of the specific payment practices of Furniture Brands International, Inc. ("FBI") and Careers' collection efforts with respect to services rendered to FBI, including but not limited to the efforts of Joan Lassman, Careers' collection specialist.

6.      Ms. Lassman maintained regular contact with FBI's accounts payable department to ensure Careers' timely receipt of payments.  Such practice was employed by Careers in the ordinary course of its business or financial affairs with FBI.

7.      At times, Ms. Lassman would advise FBI that absent payment, Careers would necessarily have to halt the provision of its temporary employees for assignment with FBI.  This also was a customary collections practice of Careers in the ordinary course of its business or financial affairs with FBI, as well as with other clients of Careers. This also occurred before the preference period.

8.      Careers' customary collections practices are a product of the staffing industry itself and associated payment process from the client to the provider, and then from the provider to the temporary staffing associates.

9.      More specifically, the general process of Careers, in the ordinary course of its business with FBI and otherwise, is as follows: i) FBI contacts Careers with specified staffing needs/requests; ii) Careers recruits individuals to fill FBI's requests based on FBI's stated preferences and requirements; iii) FBI selects and interviews individuals from a pool of candidates provided by Careers, iv) FBI dictates to Careers which individuals shall report to which worksites where they are trained by FBI and remain under the direct control and supervision of FBI; v) FBI determines in its discretion whether or not to retain selected individuals for temporary assignment with FBI, and vi) FBI determines in its discretion whether to hire and/or fire the selected candidate and also the pay rate.

10.     As for the payment process, with respect to the business relationship between Careers and FBI and/or otherwise, i) the temporary associates' hours are entered into PerfectTIME®, Careers' proprietary time and attendance solution; ii) entered time is submitted

2

to the client for the client's review and approval; iii) temporary associates are paid contingent upon client's approval of the individuals' time/hours, based on a pay rate determined by the client, and in advance of the client's payment to Careers; iv) client pays (or should pay) Careers in accordance with the terms of the parties' contractual agreement.

11.    Payments made by FBI to Careers in exchange for staffing services rendered were made for the benefit of Plaintiff's joint employees, subcontractors, contractors and/or associates who performed work for Plaintiff.

12.    Said payments were largely for employee wages and taxes and substantially for the benefit of FBI and the temporary staffing associates assigned thereto.

13.    Over the course of the entire business relationship between FBI and Careers from approximately February, 2011 through December 2013, all payments made by FBI to Careers were for the provision of employment services for workers assigned to work for FBI at FBI's designated locations. All such payments were for the benefit of the debtor, governmental authorities, those employees provided to the debtor by Careers, subcontractors of CareersUSA, and Careers' subcontractor's employees provided to the debtor.

14.    CareersUSA provided new value to FBI each week in the form of newly-provided staffing services rendered by newly-provided staffing associates, which services FBI accepted and which associates FBI selected.

15.    The payment terms between Careers and FBI, as set forth in the parties' Temporary Labor Services Agreement, which Agreement I reviewed along with the exhibits attached to the Plaintiff's Complaint, were sixty (60) days from receipt of invoice.

16.    FBI regularly and customarily issued payment to Careers within the allotted 60-day timeframe, including but not limited to a wired payment from FBI to Careers on August 30, 2013 for staffing services rendered in July and August of 2013.

17.    It is not uncommon for clients to pay by credit card, ACH, wire or check and vary their payment methods throughout the relationship. It is also common for clients to make payments at different times and not always according to exact terms especially when servicing multiple locations like FBI since different sites may approve invoices for payment at different times. For example, sometimes a site would skip an invoice or skip a person on an invoice and might pay another invoice sooner in time as the "approver" was not in town or going to be out.

3

18.      Careers provided daily personnel services to FBI as FBI requested staff to continue to operate its business. Unbeknownst to Careers was FBI's financial situation.  By providing services to FBI, it is now apparent that this assisted FBI to continue operations for the betterment of all creditors. However, to now disallow such payments would harm Careers for its benevolent assistance. Further, it is now clear that FBI knew of its financial situation and ordered staff from Careers, knowing that Careers would have to pay wages to the personnel each week, while FBI did not have to hire its own employees directly and pay their wages and taxes and which would be treated in bankruptcy as a different class of claims. To make Careers repay any amounts FBI paid to Careers during the preference period would permit FBI to get away with claim manipulation but also increase the creditor recovery amount to the detriment of one creditor that assisted FBI in running its business operations which allowed the creditor pool to be arguably higher.   Careers paid weekly wages; FBI paid Careers to reimburse for such wages with minimal profit.

19.      There are various payments in the beginning of the alleged "preference period" such as those on Exhibit A to Plaintiff's Complaint on June 13, 2013, and others towards the end of the alleged "preference period" such as those payments on June 5, 2013 and June 6, 2013, that do not appear to be within the ninety (90) day period preceding the petition date.

20.      In the event Ms. Lassman's collection efforts did not attain the desired results, Careers' collections department would enlist the assistance of Careers' legal department. Once again, this is a regular and customary practice of Careers in the ordinary course of its business or financial affairs with FBI, as well as with other clients of Careers, because temporary associates are paid by Careers before Careers receives payment from its clients for the corresponding services.

21.      With respect to FBI's account with Careers, Careers' legal department was engaged on at least two (2) occasions to assist in obtaining payment from FBI for staffing services rendered.   This occurred even before the preference period, nearly one year prior thereto.

22.      The collection efforts described above were not only customary for Careers' business/financial affairs with FBI, but the same or similar collection efforts are customary for countless clients of Careers and are generally common throughout the staffing industry.

I say nothing further.

4

_Mandy Wilson_

MANDY WILSON

BEFORE ME, the undersigned authority, personally appeared <u>Mandy Wilson</u>, who is **personally known to me** to be the individual described herein or who has produced _____ as identification, and who executed the foregoing affidavit and who did take an oath.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal in the County and State aforesaid this 27<u>th</u> day of July, 2018.



JILL R MOHLER
MY COMMISSION # FF204474
EXPIRES April 12, 2019
FloridaNotaryService.com

_Jill R. Mohler_

NOTARY PUBLIC
Name: JILL R. MOHLER
Commission or Serial No.: FF204474
My Commission Expires 4/12/2019

5

| United States Bankruptcy Court for the District of Delaware<br>Furniture Brands International, Inc. Claims Processing Center<br>c/o Epiq Bankruptcy Solutions, LLC<br>FDR Station, P.O. Box 5075<br>New York, NY 10150-5075 | **PROOF OF CLAIM FORM**<br><br>THIS SPACE IS FOR COURT USE ONLY |
|---|---|

| Name of Debtor Against Which Claim is Held: | Case No. of Debtor: |
|---|---|
| Furniture Brands International, Inc. | 13-12329 |

NOTE: *This form should not be used to make a claim for an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) arising after the commencement of the case. A "request" for payment of an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) may be filed pursuant to 11 U.S.C. § 503.*

**Name of Creditor** (the person or other entity to whom the debtor owes money or property): Careers USA

☐ Check this box to indicate that this claim amends a previously filed claim.

**Name and address where notices should be sent:**
Careers USA
Attn: Office of the General Counsel
6501 Congress Ave., Suite 200
Boca Raton, FL 33487

Court Claim Number:_____
(If known)
Filed on:_____

Telephone number: 561-995-7000    Email Address: legal@careersusa.com

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

**Name and address where payment should be sent (if different from above):**

THIS SPACE IS FOR COURT USE ONLY

Telephone number:                    Email Address:

**5.    Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).** If any portion of your claim falls in one of the following categories, check the box and state the amount.

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

**1.    Amount of Claim as of Date Case Filed:** $ 10,656.97

If all or part of your claim is secured, complete Item 4.

If all or part of your claim is entitled to priority, complete Item 5.

If all or part of your claim qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9), complete Item 6.
☐    Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of interest or additional charges.

☐ Wages, salaries or commissions (up to $12,475), earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).

☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).

**2.    Basis for Claim:** services performed    (See instruction #2 on reverse side)

**3.    Last four digits of any number by which creditor identifies debtor:** 1139
    **3a. Debtor may have scheduled account as:** _____
        (See instruction #3a on reverse side)

☐ Up to $2,775 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).

**4.    Secured Claim** (See instruction #4 on reverse side)
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.

Nature of property or right of setoff:  ☐ Real Estate    ☐ Motor Vehicle    ☐ Other
Describe: _____

Value of Property: $_____    Annual Interest Rate _____% ☐ Fixed  or  ☐ Variable
(when case is filed)

Amount of arrearage and other charges as of time case filed included in secured claim, if any:
$_____

Basis for perfection: _____

Amount of Secured Claim: $_____    Amount Unsecured: $_____

☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(___).

**Amount entitled to priority:**

$_____

**6.    Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9):** $_____    (See instruction #6 on reverse side)

**7.    Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #7 on reverse side)

**8.    Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages and security agreements. If the claim is secured, box 4 has been completed, and redacted copies of documents providing evidence of perfection of a security interest are attached. (See instruction #8 on reverse side and definition of "redacted".)
DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.
If the documents are not available, please explain:

**9.    Signature:** (See instruction #9 on reverse side)    Check the appropriate box:
☐ I am the creditor.  ☑ I am the creditor's authorized agent.  ☐ I am the trustee, or the debtor, or their authorized agent. (See Bankruptcy Rule 3004.)  ☐ I am a guarantor, surety, indorser, or other codebtor. (See Bankruptcy Rule 3005.)
(Attached a copy of power of attorney, if any)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.

Print Name: Kenneth P. Friedman    Title: Controller    Company: Careers USA
Address and telephone number
(if different from notice address above): _____

_____        _____    11/22/13
                        (Signature)                        (Date)

Telephone number: 561-995-7000    email: accountsreceivable@careersusa.com

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

Exhibit D